# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
THE COALITION FOR MERCURY-FREE   )
DRUGS (CoMeD, Inc), et al.,   )
   )
       Plaintiffs,   )     Civ. No.: 09-CV-0015
   )          (RBW)
       v.   )
   )
KATHLEEN SEBELIUS, Secretary   )
of Health and Human Services, et al.,   )
   )
       Defendants.   )
_____)

## PETITIONERS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT DISCOVERY LIMITED TO THE ISSUE OF JURISDICTION

## INTRODUCTION

In Opposition to Plaintiffs' Motion for Leave to Conduct Limited Jurisdictional Discovery, Defendants state that the Motion for Preliminary Injunction in this case is based on a July 24, 2009 CDC recommendation.[1]  In fact, the motion for preliminary relief is based on much more than that.  It is based on the Defendants' complete and total failure to protect the unborn children of the pregnant women in this country from unnecessary exposure to mercury.

Defendants state that there was no assertion that any Plaintiffs were required to take mercury-containing flu vaccines or that mercury-free vaccines were not available to them.  As

---

[1] This admission is a step forward from the Defendants' last position where they asserted that this was just some committee recommendation.

1

the Court is obviously aware, this is a fluid situation where even the Defendants could not answer simple questions at the hearing about whether or not the government was purchasing flu vaccines and how much would be mercury free.

Since the hearing in this matter, Plaintiffs have not been idle, and affidavits are being filed with this Reply that demonstrate that Plaintiffs are being required to take flu vaccines, that Plaintiffs are unable to find mercury-free vaccines despite extensive efforts to do so, that pharmacists and other medical providers, in many cases, are giving false information about what is, or is not, contained in flu vaccines, and that the fear of getting mercury in flu vaccines is preventing Plaintiffs from getting the necessary protection of flu vaccines.[2]

Defendants offer various reasons why the requested discovery should not be granted, and these will be discussed in more detail below, but even a cursory review of these reasons will demonstrate that they are not valid.

First, the Defendants complain that granting the discovery requested will be "an extraordinary waste of agency and judicial resources…."  They point to the fact that they have already produced 7,000 pages of the administrative record in this case.  What they fail to point out is that almost all of these pages are articles and materials filed by the Plaintiffs in support of their citizen petition.

In an extraordinary statement, the Defendants, referring to all of these materials provided by the Plaintiffs, tell us that the '[FDA] carefully and thoroughly analyzed every argument put forward by plaintiffs and found that the small amount of Thimerosal still contained in an ever-decreasing number of medications does not render any FDA-approved product unsafe –

---

[2]      Plaintiffs did not assert, as Defendants maintain, that mercury-free products were available, but only that there should be an adequate supply of such vaccines to make them available to all pregnant women.  This is a big difference, as many of the affidavits filed with this Reply illustrate.

including flu vaccine.  This conclusion, based on FDA's scientific expertise – which is subject to great deference, is not arbitrary or capricious in any respect."

This statement is wrong on so many levels; it is hard to know where to start.  First of all, the articles and materials filed by the Plaintiffs in the citizens' petition did not "render" anything unsafe.  What those articles do is demonstrate just how dangerous mercury is, particularly for the developing fetus and young children.  Secondly, the "safe" levels of mercury have been set by the government, not the Petitioners, and the only evidence of any safe level in this case is the EPA guideline of 0.1 micrograms per kilogram of body weight per day.  It does not take the "scientific expertise" of the FDA to demonstrate that a child who receives 25 micrograms of mercury from a flu shot would have to weigh 550 pounds to fall within the government's own safety limits.  Simple eighth grade math will suffice, so no deference is required.  Additionally, while the Defendants seem proud of the fact that they have removed mercury from other products, this begs the question as to why they should take this position.  If mercury is so safe for pregnant women and children, born and unborn, then why are the Defendants so anxious to point out how good a job they have done removing it from other products.

The other point to be made about this statement is that the Plaintiffs have alleged and have provided evidence in support of their allegations that flu vaccines are being illegally licensed for use in anyone, let alone pregnant women.  It is the manufacturers' legal duty to demonstrate that the preservative (in this case, Thimerosal) in any preserved product IS safe.  It is not the Plaintiffs' duty to show that it is unsafe, but nevertheless Plaintiffs have done so, and Plaintiffs are prepare to go to hearing at any time with expert witnesses to demonstrate the extreme dangers of Thimerosal, particularly for the developing fetus.

Finally, and most importantly, there is no reason why the Defendants should argue that producing the information requested will constitute "time-consuming and burdensome discovery…."  All of the information requested should be a mouse-click away if, as is alleged on page 5 of the Opposition:  "The federal government and the states have put a tremendous effort into planning for the 2009-2010 flu season, both with respect to seasonal flu and the H1N1 flu." An essential part of planning is documentation of the plan, so presumably, the information requested is easily accessible.  And no, the Plaintiffs do not want to "disrupt this planning." Plaintiffs want to hold the Defendants accountable for their lack of planning with respect to pregnant women.  Defendants correctly point out that the "FDA has many competing priorities," but apparently protecting unborn children from exposure to levels of mercury that are hundreds of times in excess of their own guidelines is not one of them.

Secondly, the Defendants argue that no case has been cited in support of Plaintiffs requests, and that all of the cases cited deal with personal jurisdiction.  This is dealt with in more detail below.  Defendants state that Plaintiffs should not be allowed discovery of information solely under their control to "see if they might have an injury sufficient to invoke the Article III jurisdiction of this Court."  Discovery to determine whether or not there is standing is nothing new, and failure to allow it has been adequate grounds for appeal in other cases.  Unfortunately, in this case, grounds for an appeal will do nothing to protect the countless members of CoMeD who will either get a mercury containing shot despite best effort not to, or who will be unable to find a mercury-free shot, or who will be so afraid of getting the wrong one that they will forego the protection of a flu shot.[3]  So, even without any discovery from the Defendants, the Plaintiffs

---

[3]   Some of the horror stories outlined in some of the affidavits include the unsettling information that at least one manufacturer only lists Thimerosal as an ingredient on the box that contains the multi-dose vial, so when the doctor throws out the box and puts the vial in the refrigerator, that vial contains no information at all about the

have been able to obtain a great deal of troubling information that demonstrates that the imminent injuries to CoMeD members are much more serious than previously suspected.

Third, the Defendants argue that the motion for a preliminary injunction relates to seasonal flu and not the H1N1 flu. There are two things to say about this. First of all, the motion for preliminary injunction relates to all flu vaccines, and this is dealt with in more detail below. Secondly, however, it is somewhat inconsistent for the Defendants to argue that these are different vaccines that need to be treated differently. For one thing, the FDA approved the H1N1 vaccines for pregnant women without any clinical trials, and their justification for this was that they don't expect it to be any different than last year's seasonal flu vaccine. Of course, they made the reverse argument after the fiasco of the 1976 Swine Flu vaccine that caused so much Guillain-Barre Syndrome. In the years following that vaccine, they tried to convince people that there was something different about the Swine Flu vaccine that resulted in these adverse events, and that subsequent flu vaccines were safe.

The Defendants' fourth argument is that we are only dealing with a CDC recommendation, and the members of CoMeD are free to disregard this recommendation. As the declarations of Dr. John Young pointed out, CDC recommendations basically set the standard of care for health care providers nationwide.

But the plot thickens. Now the Defendants are saying yes, "the government is purchasing it [all the H1N1 vaccine] so it can be made available to all free of charge." But now they are saying that "the actual manner in which this vaccine will be made available to individuals is

_____

fact that a shot will contain 25 micrograms of mercury. And women cannot rely on what looks like a single dose shot to be mercury free, because some pharmacists are loading syringes from multi-dose vials and selling them as single dose shots. Even the most informed member of CoMeD cannot assure receipt of a mercury-free product.

<u>determined by the states</u>.  It is the states that place orders for the vaccine (and they specify which type – thimerosal-free, or thimerosal-preserved), and determine how the vaccine is distributed within each state, <u>i.e.</u>, doctors' offices, clinics, hospitals, etc."  So, in other words, the Defendants are saying that if members can't get the mercury-free vaccines, they should blame the states.

Again, this statement is so wrong on so many levels, that once again it is hard to know where to start.  First of all, there are six states that have passed laws banning mercury in their vaccines, so, according to the Defendants, those states should have no problem getting all thimerosal-free flu vaccines.  Apparently, this is not the case, since the Washington state health department has had to invoke an exception to the mercury-free law from their state legislature in order to assure that they could get enough flu vaccines for their citizens.  So CoMeD members in Washington State, who previously could rely on their state to protect them, can no longer do so.  Furthermore, Plaintiffs simply do not believe that the federal government exerts no influence over what vaccines go to which states.  While CoMeD members may be able to disregard the CDC, the states certainly cannot and do not.

Plaintiffs are in the process of obtaining information about how the vaccines are allocated to the states and to the distribution centers around the country from other sources, but Plaintiffs firmly believe that discovery, if allowed, will demonstrate that the Defendants (who, as they say have been involved in extensive planning with the states) are the ones who have control over how and where flu vaccines of both types are distributed.  And yes, the Plaintiffs are challenging the manner in which flu vaccines are being made available to the public.  Clearly, the evidence so far indicates that the manner of distribution is not adequately protecting the members of CoMeD who are of childbearing age from receiving mercury in their flu shots.  To the contrary,

the lack of evidence, misinformation and examples from footnote 3 are causing the additional injuries to CoMeD members who can no longer trust the Defendants and will therefore not get a flu vaccine.[4]

In their Opposition to Plaintiffs' Motion for Leave to Conduct Limited Jurisdictional Discovery, Defendants continue to assert, as they did in their initial Motion to Dismiss and during the appearance on August 26, 2009, that Plaintiffs lack standing to bring this matter, both the Complaint and the Motion for Preliminary Injunction, before this Court.

In its complaint, CoMeD asserts:

> Plaintiff, The Coalition for Mercury-free Drugs (CoMeD) is a 501(C)(3) not-for-profit group with its principal place of business at Silver Spring Maryland. CoMeD is dedicated to reducing the mercury-exposure risks, for the unborn, infants, children, adolescents and adults, from all mercury-containing medical products to which they are, or may be, exposed and includes numerous persons who have been exposed to such products

The assertion that Plaintiff CoMeD includes persons who have been or will be injured by these drug products, and in particular the pregnant women the requested preliminary injunction seeks to protect, is supported here by declarations of pregnant or seeking to become pregnant members of CoMeD who have been unable to determine if the flu vaccines they have been offered are Thimerosal free.  Therefore, due to the confusion among members of the medical

---

[4]    At the ACCV meeting referred to hereafter, undersigned counsel challenged Defendants that, if mercury in flu vaccines is so safe for pregnant women, then they should have no problem finding 1,000 women willing to take such shots.  They could then match them with 1,000 similar women who receive mercury-free shots and 1,000 women who receive no flu shots.  Of course, such a study could never be done because it would be unethical. First of all, given the type of informed consent required in a clinical study, no pregnant woman in her right mind would be willing to risk taking a mercury containing shot.  After all, we tell pregnant women not to drink alcohol, drink coffee or eat fish, so why would any conscientious mother-to-be run such an absurd risk. Likewise, no study could allow pregnant women to go without a flu shot, if it is as important as the Defendants maintain.  In the face of all of this, CoMeD members, despite our best efforts to warn them, will undoubtedly, inadvertently get mercury containing shots, and many others will not get vaccine protection, either because they cannot get mercury-free vaccines or will be so afraid of getting the wrong thing that they will forego vaccination.  The Defendants are responsible for this dilemma, and trying to shift responsibility to the states is, at the very least, disingenuous.

profession as to that fact, these informed women have declined to take any flu vaccination at all. This exposes them to increased likelihood of injury from the disease.  This injury in fact is caused by the uncertainty engendered by the illegal actions of the Defendants in declining to enforce the law and require adequate labeling or to set the standard of practice in such a way that members of the public, such as those who are members of CoMeD, are warned of the potential dangers posed by Thimerosal to unborn children.

Plaintiffs respectfully submit that the CFR and pertinent case law, *Federal Election Com'n v. Akins*, 524 U.S. 11 (1998), provide the requisite statutory and precedential case law authority for Plaintiffs to have standing to be heard by this Court.

**ARGUMENT**

**I.     PLAINTIFFS ARE AN "INTERESTED PERSON" UNDER 21 CFR 10.45(d)(1) AND, AS SUCH, HAVE STANDING TO OBTAIN JUDICIAL REVIEW OF A FINAL AGENCY ACTION**

Defendants argue that this motion for standing discovery should be denied as futile as the information sought is irrelevant.  However, the issue is whether the Plaintiff CoMeD has a member with an injury related to the Defendants' actions, a status providing Article III standing as well as statutory standing.

21 CFR 10.45(d)(1) reads as follows:

> (1) It is the position of FDA except as otherwise provided in paragraph (d)(2) of this section, that:
> > (i) Final agency action exhausts all administrative remedies and is ripe for preenforcement judicial review as of the date of the final decision, unless applicable law explicitly requires that the petitioner take further action before judicial review is available;

(ii) An **interested person is affected by, and thus has standing to obtain judicial review of final agency action**; and
(iii) **It is not appropriate to move to dismiss a suit for preenforcement judicial review of final agency action on the ground that indispensable parties are not joined** or that it is an unconsented suit against the United States if the defect could be cured by amending the complaint.  [Emphasis supplied.]

21 CFR 10.45(d)(2), which does not apply in this case, reads as follows:

(2) The Commissioner shall object to judicial review of a matter if:
(i) The matter is committed by law to the discretion of the Commissioner, e.g., a decision to recommend or not to recommend civil or criminal enforcement action under sections 302, 303, and 304 of the act; or
(ii) Review is not sought in a proper court.

21 CFR 10.3 defines "interested person" as follows:

Interested person or any person who will be adversely affected means **a person who submits a petition or comment or objection or otherwise asks to participate in an informal or formal administrative proceeding or court action.**  [Emphasis supplied.]

42 U.S.C. Section 300aa-31

(a) General rule

Except as provided in subsection (b) of this section, **any person may commence** in a district court of the United States a civil action **on such person's own behalf** against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under this part.

(b) Notice

No action may be commenced under subsection (a) of this section before the date which is 60 days after the person bringing the action has given written notice of intent to commence such action to the Secretary.

[Emphasis added in all of the preceding regulations.]

As was established in open court (and in the attached documents), CoMeD did give the Secretary the notice required.

In the matter at hand, Plaintiff CoMeD, Inc., by virtue of the fact that they submitted a Citizen Petition to the FDA, became an "interested person" under the definitions in 21 CFR 10.3. Therefore, under the mandates set forth in 21 CFR 10.45(d)(1), it is the FDA's position that Plaintiff CoMeD has the standing to bring this matter before this Court.  CoMeD also having given the notice required under 42 U.S.C. §300aa-31 has standing.

Accordingly, the Court should grant Plaintiff's Motion for Limited Jurisdictional Discovery.

**II.     UNDER THE SUPREME COURT'S DECISION IN *FEC. V. AKINS*, AND DUE TO THE MEMBERSHIP IN COMED OF PREGNANT WOMEN WHO ARE BEING INJURED BY THE DEFENDANTS' ACTIONS, PLAINTIFFS HAVE STANDING DUE TO THE FACT THAT REGULATIONS GRANT THEM THE ABILITY TO HAVE THE DENFENDANTS' ADMINISTRATIVE DECISIONS REVIEWED BY THIS COURT**

On this motion, Plaintiff CoMeD has submitted supplementary declarations from well-informed pregnant CoMeD women who have been either unable to find mercury-free vaccine or have been unable to determine if the vaccine they are being offered is mercury free due to the confusing information both in the accompanying package insert and received from clinicians at vaccination clinics.

The lack of mercury-free vaccine has been confirmed by Cecelia Bowers, a nurse running a clinic in Virginia who states that her clinic does not have any mercury-free vaccine available for pregnant women.

In all cases, the CoMeD women have refused all flu vaccinations to protect their unborn

child from potential injury.  The CoMeD pregnant women are being denied the protection afforded by that vaccine all due to the illegal actions of the defendants in failing to set a standard of practice protecting pregnant women from all exposure to mercury, including that in more than half of the flu vaccine supply being produced for this flu season that can be given to pregnant women.

Discovery is required to determine if the experience of the CoMeD women and Ms. Bowers is an exception to the rule or is a situation created by the actions of the Defendants.   The major issue at this late date is the failure of the Defendants to set a standard of practice to protect pregnant women from mercury.  Therefore, many sellers of the vaccine (large drug chains) apparently do not see the need to offer the mercury-free version, which costs more, where the Defendants show no preference for the mercury-free vaccine for this or any other vulnerable subgroup.  Thus, the amount of mercury-free vaccine which is also suitable for pregnant women and its allocation by the defendants is material to the issue of standing to confirm or otherwise explain the difficulty informed CoMeD pregnant women are now having when they seek the safer seasonal flu vaccine and to determine if these problems will be repeated when the A/H1N1 vaccines are available.

On these facts, Article III as well as the CFR has conferred this Court with the authority to hear Plaintiffs' Complaint and to allow the Plaintffs access to sufficient information to establish standing.

In *FEC v. Akins*, 524 U.S.11, the Supreme Court held that those "respondents, a group of voters, have standing to challenge the Commission's determination in court", and remanded that case for further proceedings.  Id. at 14.

The Federal Election Commission (FEC) has determined that the American Israel Public Affairs Committee (AIPAC) is not a "political committee" as defined by the Federal Election Campaign Act of 1971 (FECA or Act), 86 Stat. 11, as amended, 2 U.S.C. § 431(4), and, for that reason, the FEC has refused to require AIPAC to make disclosures regarding its membership, contributions, and expenditures that FECA would otherwise require. We hold that respondents, a group of voters, have standing to challenge the Commission's determination in court, and we remand this case for further proceedings. Id. at 14.

In that case, a group of voters sought review of the Federal Election Commission's (FEC) decision dismissing their administrative complaint, which alleged that an organization was a "political committee" under the Federal Election Campaign Act (FECA), and thus, should have been subject to registration and reporting requirements. The facts of that case are as follows:

This case arises out of an effort by respondents, a group of voters with views often opposed to those of AIPAC, to persuade the FEC to treat AIPAC as a "political committee." Respondents filed a complaint with the FEC, stating that AIPAC had made more than $1,000 in qualifying "expenditures" per year, and thereby became a "political committee." 1 Record, Exh. B, p. 4. They added that AIPAC had violated the FEC provisions requiring "political committee[s]" to register and to make public the information about members, contributions, and expenditures to which we have just referred. *Id.,* at 2, 9-17. Respondents also claimed that AIPAC had violated § 441b of FECA, which prohibits corporate campaign "contribution[s]" and "expenditure[s]." *Id.,* at 2, 16-17. They asked the FEC to find that AIPAC had violated the Act, and, among other things, to order AIPAC to make public the information that FECA demands of a "political committee." Id. at 15-16.

Similarly, in the case at hand, Plaintiffs petitioned the FDA to recall all batches of multi-dose vaccines that contain a Thimerosal preservative level of more than 0.001 %, for the reason that under the authority conferred upon the FDA by the National Childhood Vaccine Injury Act of 1986, the FDA is directed to minimize the risk of adverse reactions to vaccines and Plaintiffs submitted evidence to the FDA demonstrating that all such multi-dose (Thimerosal preserved)

vaccine formulations are now a proven health hazard to susceptible individuals of all ages and therefore, a recall would reduce the risk of adverse reactions.

> AIPAC asked the FEC to dismiss the complaint. AIPAC described itself as an issue-oriented organization that seeks to maintain friendship and promote goodwill between the United States and Israel. App. 120; see also Brief for AIPAC as *Amicus Curiae* (AIPAC Brief) 1, 3. AIPAC conceded that it lobbies elected officials and disseminates information about candidates for public office. App. 43, 120; see also AIPAC Brief 6. But in responding to the § 441b charge, AIPAC denied that it had made the kinds of "expenditures" that matter for FECA purposes (*i.e.,* the kinds of election-related expenditures that corporations cannot make, and which count as the kind of expenditures that, when they exceed $1,000, qualify a group as a "political committee"). Id. at 16.

> The FEC's General Counsel concluded that, between 1983 and 1988, AIPAC had indeed funded communications of the sort described. The General Counsel said that those expenditures were campaign related, in that they amounted to advocating the election or defeat of particular candidates. App. 106-108. He added that these expenditures were "likely to have crossed the $1,000 threshold." *Id.,* at 146. At the same time, the FEC closed the door to AIPAC's invocation of the "communications" exception. The FEC said that, although it was a "close question," these expenditures were not membership communications, because that exception applies to a membership organization's communications with its members, and most of the persons who belonged to AIPAC did not qualify as "members" for purposes of the Act. App. to Pet. for Cert. 97a-98a; see also App. 170-173. Still, given the closeness of the issue, the FEC exercised its discretion and decided not to proceed further with respect to the claimed "corporate contribution" violation. Id. at 17.
> …

> The FEC nonetheless held that AIPAC was not subject to the disclosure requirements, but for a different reason. In the FEC's view, the Act's definition of "political committee" includes only those organizations that have as a "major purpose" the nomination or election of candidates. …AIPAC, it added, was fundamentally an issue-oriented lobbying organization, not a campaign-related organization, and hence AIPAC fell outside the definition of a "political committee" regardless. App. 146. The FEC consequently dismissed respondents' complaint.

Here, the FDA denied Plaintiffs Citizen Petition by stating that neither the law nor science supported Plaintiffs' contention that 'the few products'[5] that remain on the market today which contain Thimerosal are unsafe.[6]

> Respondents filed a petition in Federal District Court seeking review of the FEC's determination dismissing their complaint. See §§ 437g(a)(8)(A), 437g(a)(8)(C). The District Court granted summary judgment for the FEC, and a divided panel of the Court of Appeals affirmed. 66 F.3d 348 (C.A.D.C.1995). The en banc Court of Appeals reversed, however, on the ground that the FEC's "major purpose" test improperly interpreted the Act's definition of a "political committee." 101 F.3d 731 (C.A.D.C.1996). We granted the FEC's petition for certiorari, which contained the following two questions:
>
> "1. Whether respondents had standing to challenge the Federal Election Commission's decision not to bring an enforcement action in this case.
>
> "2. Whether an organization that spends more than $1,000 on contributions or coordinated expenditures in a calendar year, but is neither controlled by a candidate nor has its major purpose the nomination or election of candidates, is a 'political committee' within the meaning of the [Act]." Brief for Petitioner I.
>
> We shall answer the first of these questions, but not the second.

In holding that the Respondents in that case had standing to challenge the FEC's dismissal of their Complaint, that Court analyzed the issue of standing as follows:

> The Solicitor General argues that respondents lack standing to challenge the FEC's decision not to proceed against AIPAC. He claims that they have failed to satisfy the "prudential" standing requirements upon which this Court has insisted…He adds that respondents have not shown that they "suffe[r] injury in fact," that their injury is "fairly traceable" to the FEC's decision, or that a judicial decision in their favor would "redres[s]" the injury…In his view, respondents' District Court petition consequently failed to meet Article III's demand for a "case" or "controversy." Id. at 20.

---

[5]   Plaintiffs would not agree that over 40 products that still contain mercury are a "few."

[6]   Defendants still refuse to admit that the law is very clear that it is not Plaintiffs' burden to prove that Thimerosal is unsafe; it is the manufacturer's obligation to demonstrate safety of any preservative, and, without such proof, the FDA cannot license any Thimerosal-preserved vaccine.  The law is being blatantly violated.

In the case at hand, Defendants, too, assert that Plaintiffs lack standing to bring this matter before this Court, because "plaintiffs cannot base standing on allegations of injury to the general public (as they are trying to do), nor on allegations pertaining to non-plaintiffs or non-members of CoMeD such as the Women's Division of the General Board of Global Ministries of the United Methodist Church…"  Opposition , pg. 2.

> We do not agree with the FEC's "prudential standing" claim. Congress has specifically provided in FECA that "[a]ny person who believes a violation of this Act ... has occurred, may file a complaint with the Commission." § 437g(a)(1). It has added that "[a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party ... may file a petition" in district court seeking review of that dismissal. § 437g(a)(8)(A). History associates the word "aggrieved" with a congressional intent to cast the standing net broadly-beyond the common-law interests and substantive statutory rights upon which "prudential" standing traditionally rested. Id. at 20.

> Moreover, prudential standing is satisfied when the injury asserted by a plaintiff " 'arguably [falls] within the zone of interests to be protected or regulated by the statute ... in question.' "The injury of which respondents complain-their failure to obtain relevant information-is injury of a kind that FECA seeks to address…We have found nothing in the Act that suggests Congress intended to exclude voters from the benefits of these provisions, or otherwise to restrict standing, say, to political parties, candidates, or their committees. Id. at 20.

Similarly, here, Plaintiff CoMeD, Inc.,"… [falls] within the zone of interests to be protected or regulated by the statute ... in question" by virtue of the fact that they submitted a Citizen Petition to the FDA, and, thus, became an "interested person" under the definitions in 21 CFR 10.3.  Therefore, under the mandates set forth in 21 CFR 10.45(d)(1), it should be the FDA's position that Plaintiff CoMeD has the standing to bring this matter before this Court.

> Given the language of the statute and the nature of the injury, we conclude that Congress, intending to protect voters such as respondents from suffering the kind of injury here at issue, intended to

authorize this kind of suit. Consequently, respondents satisfy "prudential" standing requirements.

Nor do we agree with the FEC or the dissent that Congress lacks the constitutional power to authorize federal courts to adjudicate this lawsuit. Article III, of course, limits Congress' grant of judicial power to "cases" or "controversies." That limitation means that respondents must show, among other things, an "injury in fact"-a requirement that helps assure that courts will not "pass upon ... abstract, intellectual problems," but adjudicate "concrete, living contest[s] between adversaries." In our view, respondents here have suffered a genuine "injury in fact." Id. at 20-21.

The "injury in fact" that respondents have suffered consists of their inability to obtain information-lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures-that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute. Id. at 21.

Similarly, in this case, the information that the Plaintiffs seek to have the Defendants provide to the public is clear meaningful information on the presence and level of added mercury in each vaccine dose, without which, the individual's ability to give "informed consent" does not exist.

The FEC's strongest argument is its contention that this lawsuit involves only a "generalized grievance."…The FEC points out that respondents' asserted harm (their failure to obtain information) is one which is " 'shared in substantially equal measure by all or a large class of citizens.' " …This Court, the FEC adds, has often said that "generalized grievance[s]" are not the kinds of harms that confer standing…Whether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a

widely shared grievance. Id. at 21.

The kind of judicial language to which the FEC points, however, invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature-for example, harm to the "common concern for obedience to law." …The abstract nature of the harm-for example, injury to the interest in seeing that the law is obeyed-deprives the case of the concrete specificity that characterized those controversies which were "the traditional concern of the courts at Westminster," …and which today prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion. Id. at 23-24.

Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and **where a harm is concrete, though widely shared, the Court has found "injury in fact." …**Thus the fact that a political forum may be more readily available where an injury is widely shared (while counseling against, say, interpreting a statute as conferring standing) does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an "injury in fact." This conclusion seems particularly obvious where (to use a hypothetical example) large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law. We conclude that, similarly, the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts.  Id. at 24-25.  [Emphasis supplied.]

Here, as in FEC v. Akins et al., the harm is concrete, not abstract.  In the matter at hand, the harm that may result to developing fetuses and pregnant women is that of disability due to an adverse reaction to a preservative that they could have avoided had Defendants simply made available the information of the level of Thimerosal present in each dose of the vaccine.  Thus, even though such a harm may be widely shared, it is still concrete, and, thus, this Court may and should find "injury in fact" and hold in Plaintiffs' favor on the issue of standing.

Respondents have also satisfied the remaining two constitutional standing requirements. The harm asserted is "fairly traceable" to the

FEC's decision about which respondents complain. Of course, as the FEC points out, Brief for Petitioner 29-31, it is possible that even had the FEC agreed with respondents' view of the law, it would still have decided in the exercise of its discretion not to require AIPAC to produce the information... But that fact does not destroy Article III "causation," for we cannot know that the FEC would have exercised its prosecutorial discretion in this way. Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground…If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case-even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason. _SEC v. Chenery Corp.,_ 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Thus respondents' "injury in fact" is "fairly traceable" to the FEC's decision not to issue its complaint, even though the FEC might reach the same result exercising its discretionary powers lawfully. For similar reasons, the courts in this case can "redress" respondents' "injury in fact."  Id. at 25.

Finally, the FEC argues that we should deny respondents standing because this case involves an agency's decision not to undertake an enforcement action-an area generally not subject to judicial review….In _Heckler,_ this Court noted that agency enforcement decisions "ha[ve] traditionally been 'committed to agency discretion,' " and concluded that Congress did not intend to alter that tradition in enacting the APA…We deal here with a statute that explicitly indicates the contrary.  Id. at 26.

In sum, respondents, as voters, have satisfied both prudential and constitutional standing requirements. They may bring this petition for a declaration that the FEC's dismissal of their complaint was unlawful. See 2 U.S.C. § 437g(a)(8)(A).  Id. at 26.

Here, similar to the Respondents in _FEC v. Akins_, Plaintiffs commenced this action pursuant to 42 U.S.C. § 300aa-31 and the Administrative Procedures Act, as reflected in the regulations governing the U.S. Food and Drug Administration (FDA) in 21 CFR PART 10— ADMINISTRATIVE PRACTICES AND PROCEDURES (21 CFR Part 10), for a review of the rejection by the Defendants of Plaintiffs' Citizens Petition, which demanded that the Defendants

either produce affirmative evidence of safety submitted by manufacturers or revoke the licenses of all products within the Defendants' jurisdiction which contain added mercury, including, but not limited to, vaccines and other drug products using Thimerosal, a trade name for ethylmercurithiosalicylate sodium, as a preservative.   The Complaint at issue reiterates the arguments presented by Plaintiffs to the FDA and the DHHS, and which the FDA declined to act upon.

Defendants subsequently submitted a Motion to Dismiss, to which the Plaintiffs Responded and the Defendants subsequently submitted a Reply.

Plaintiffs sought to enjoin the Defendants from: a) approving any Thimerosal-preserved influenza vaccines for use in pregnant women; and b) directly or indirectly, recommending administration of Thimerosal-preserved influenza vaccines to pregnant women.

Further, Plaintiffs sought an Order compelling Defendants to take any and all actions necessary to ensure that Thimerosal-preserved influenza vaccines are not given to pregnant women.

Defendants assert in their Opposition papers to Plaintiffs' currently pending Motion that Plaintiff's did not make any allegations about the Thimerosal content of the A/H1N1 vaccination that is the subject of Plaintiff's Motion for Preliminary Injunction, and, therefore, Plaintiff's Motion for Limited Jurisdictional Discovery should be denied.   However, the Complaint alleges in paragraph 50 as follows:

> Ironically, this nation's federal health agencies continue to assert Thimerosal-containing drugs are safe for administration to pregnant women, unborn children, newborns and toddlers, while simultaneously advising the public to limit consumption of tuna and other large fish, because of the proven risk of non-reversible neurological damage, to developing fetuses and growing children, from the low levels of

methyl mercury (a related alkyl mercury compound) that such fish contain.

This allegation is the basis of Plaintiffs' Motion for Preliminary Injunction, wherein

Plaintiffs state as follows:

> Pursuant to Fed. R. Civ. P. 65, Plaintiffs, CoMeD et al., respectfully move for entry of a preliminary injunction to enjoin Defendants from: a) approving any Thimerosal-preserved influenza vaccines for use in pregnant women; and b) directly or indirectly, routinely recommending administration of Thimerosal-preserved influenza vaccines to pregnant women.

> Further, Plaintiffs seek an Order compelling Defendants to take any and all actions necessary to ensure that Thimerosal-preserved influenza vaccines are not given to pregnant women, as well as stop any general recommendation that Thimerosal-preserved vaccines be given to pregnant women until these vaccines are proven to be sufficiently nontoxic to the fetus, the developing child and the pregnant woman, with at least a 10-fold safety margin in the appropriate scientifically sound toxicity studies.   See Plaintiffs' Motion for Preliminary Injunction.

Clearly, the subject matter of the Motion for Preliminary Injunction is merely a subset of

the allegation of Plaintiffs' Complaint.  Accordingly, Defendant's suggestion that the allegations

of the Motion for Preliminary Injunction are not within the Complaint are baseless and should

not be given any credence.  Therefore, Defendant's Motion to Dismiss should be denied and

Plaintiffs' Motion for Limited Jurisdictional Discovery should be granted.


### III.   PLAINTIFFS' COMPLAINT ASSERTS ALL THE CLAIMS NECESSARY TO SUPPORT THIS MOTION TO PRELIMINARILY ENJOIN THE CONDUCT SPECIFICALLY COMPLAINED OF AND FOR THE ASSOCIATED JURISCICTIONAL DISCOVERY

The complaint in this action states:

> 78.   Given the preceding, there should be no approval to inject, or otherwise administer to, **susceptible pregnant women,** newborns and

children any preserved biological preparation containing Thimerosal, a known neurotoxic drug, that has not been <u>proven</u> to be safe at any level and, at the levels in the current Thimerosal-containing flu vaccines and other similar vaccines, has been clearly implicated in adverse neurological outcomes, including attention deficit disorders and autism.

79. Thus, high governmental officials, by authorizing the manufacture, distribution, and, most importantly, the use of vaccines and other drug and biological products containing neurotoxic ingredients, including, but not limited to, Thimerosal, that have not been unequivocally proven to be safe (with at least a 10 X safety margin) to all who may receive said products, have been and are, **in effect, responsible for performing uncontrolled involuntary experiments on susceptible pregnant women, fetuses**, newborns, children, and the rest of the public under the guise of protecting them from various diseases. [Emphasis supplied.]

Therefore, contrary to the Defendants' contention, seeking to enjoin a continuation of the pattern of unlawful conduct complained which injures a specific class of persons, which includes members of the Plaintiffs' organization, is not an attempt to amend the complaint.


## IV. PLAINTIFFS HAVE BASED THEIR DEMANDS FOR JURISDICTIONAL DISCOVERY ON THE QUESTIONS ASKED BY THE COURT

The Plaintiffs seek to answer specific questions raised by the Court as to the likelihood of harm to the CoMeD members due to the amount and content of the flu vaccine being produced and distributed. Further investigation has revealed a slightly different problem, that the confusion in the market caused by the Defendants' refusal to set the standard of practice so as to protect pregnant women and their unborn children and the confusing literature approved to inform the public and the medical profession, has created a negative injury, namely that informed women cannot find vaccine which they can be sure is mercury free. These women have generally decided to refuse any flu vaccine rather than to risk any injury to their unborn child.

Thus, CoMeD's members are injured by being denied the protection of the flu vaccination and are thus exposed to an increased risk of getting the flu with the increased risk of injury upon which the Defendants have based their recommendation that all pregnant women be vaccinated.

Indeed, in most cases CoMeD members could not find mercury-free vaccine available at all.  Therefore, because of Defendants' failing to recommend that pregnant women not be given mercury-preserved vaccine, many drug chains are simply not stocking the Thimerosal-free vaccine as the Defendants' recommendations are advising them that to do so is unnecessary.

The discovery in issue is also designed to determine what the likelihood of injury to pregnant women was within the Women's Division, given that organization's ability to inform its members of the risks.  The declaration of Frank Kowar, a Methodist Minister, indicates that the position of the Women's Division is unknown to the pregnant and childbearing-age members of his congregation who are active members of the United Methodist Women, its local organized unit.  He explains that the Women's Division has a very limited ability to communicate urgent information to its members in a short span of time, such as the time from when the "emergency" A/H1N1 vaccination program was announced to the time it will begin being administered.  Thus, those members are dependent on the Defendants to protect them from harm, and the Women's Division is not an effective substitute.

However, given the affidavits from members of CoMeD and witnesses as to the situation in the market place, it is clear that informed pregnant women such as the CoMeD members will simply not get the protection of the flu vaccination and members of the Women's Division are far more likely than not, to receive Thimerosal-preserved vaccine due to the profound level of ignorance engendered by the Defendants' actions.

Nearly all providers of vaccine were aware that a live-virus vaccine (e.g., the seasonal MedImmune FluMist or A/H1N1 "mist" vaccine) is not to be given to pregnant women, due to the Defendant Secretary's advice, through the recommendations issued by the Centers for Disease Control and Prevention (CDC), as to that product.  The relief requested here is for the Defendants to act with the same level of honest disclosure in regard to mercury-preserved vaccines.  This would set the standard of practice in such a way as to assure that non-mercury-preserved vaccine is allocated for pregnant women, and would achieve the desired result of protecting unborn children form injury, and allow CoMeD members who are pregnant to find the safest vaccine.

## V.   CASES CITED BY THE DEFENDANTS ARE NOT MATERIAL TO THE ISSUES BEFORE THIS COURT

Discovery is mandated when the facts needed to establish a point are in the possession of the opposing party.  The questions raised by the Court included:  how much seasonal inactivated-influenza vaccine and inactivated-A/H1N1 flu vaccine is being produced, how much of those doses is Thimerosal preserved and Thimerosal free, and what plans do the Defendants have as to the distribution of these vaccines.  For the A/H1N1 vaccines, some of this information is now available to the Plaintiffs without discovery.   At a recent ACCV[7] meeting, an official from the FDA indicated that the A/H1N1 vaccines being purchased by the government will be 50% with Thimerosal and 50% without Thimerosal (an unspecified percentage of which will be a live-virus vaccine that is not to be given to pregnant women).  This ACCV statement does not answer the question, however, about how these vaccines are being distributed to assure availability of the mercury-free vaccines for pregnant women and children.  Further, based on the additional

---

[7]   The Advisory Commission on Childhood Vaccines is a committee created by the Secretary of Health and Human Services pursuant to 42 USCS § 300aa-19.

information now provided by CoMeD's members, it is apparent that there are areas where Thimerosal-free inactivated-flu vaccine is not available, denying CoMeD's informed members any access to the protection afforded by a vaccine.  Thus, information as to distribution is critical to determining whether an informed person, such as a CoMeD member, would have any access to mercury-free vaccine and, as a result, would establish the likelihood of injury to Women's Division members with less information.  Thus, the information requested is relevant to the likelihood of injury.

Cases relied upon by the Defendants relate to discovery seeking information which would have no effect on jurisdiction.  In *Baptist Memorial Hosp. V. Johnson*, 603 F. Supp. 40, 44 D.D.C. 2009), discovery could not have established that a non-discretionary duty existed justifying mandamus.  In *Cheyenne-Arapaho Tribes v. US* 558 F. #d 592, 596 (D.C. Cir. 2009) the discovery sought was only relevant to a theory of jurisdiction already rejected by the Court. Here, in full compliance with the requirements set forth in *Cheyene-Arapaho Tribes v. US,* 517 F. Supp 2d. 365, 367 (D.D.C. 2007) also relied upon by the Defendants, Plaintiffs have set forth precisely what information Plaintiffs are seeking and how that information directly relates to the likelihood of injury to Plaintiff CoMeD's members, a fact directly related to jurisdiction.

## CONCLUSION

For all of the reasons stated, Plaintiffs would respectfully request that the Court grant their request to conduct jurisdictional discovery for the purposes of their motion for preliminary injunction.

Since the Defendants keep asking that their motion to dismiss be granted, Petitioners want to make it clear that this motion only deals with the preliminary injunction standing, and before

any decision is ever made on the underlying motion to dismiss, Plaintiffs would request a

separate hearing on that matter.


Respectfully submitted:

s/Clifford J. Shoemaker
Clifford Shoemaker, Esq.
9711 Meadowlark Road
Vienna, VA 22182
Phone: 703 281 6395
Fax: 703 281 5807


John F. McHugh, Esq.  (JM 1240)
6 Water Street
Suite 401
New York, NY  10001
Phone:  212 483 0872
Fax:  212 483 0873